[Cite as *State v. Graham*, 2026-Ohio-1924.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

  v.

DEDRIC V. GRAHAM,

    DEFENDANT-APPELLANT.

CASE NO. 1-25-41

OPINION AND
JUDGMENT ENTRY

Appeal from Allen County Common Pleas Court
Trial Court No. CR2024 0222

Judgment Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Decision: May 26, 2026

APPEARANCES:

    *Andrew Ray* for Appellant

    *John R. Willamowski, Jr.* for Appellee

**WALDICK, J.**

{¶1} Defendant-appellant, Dedric Graham ("Graham"), appeals the judgment of conviction and sentence entered against him in the Allen County Court of Common Pleas, following a jury trial in which Graham was found guilty on all counts of an 11-count indictment charging various sex offenses against a minor victim. For the reasons set forth below, we affirm in part and reverse in part.

*Procedural History*

{¶2} This case originated on November 14, 2024, when an Allen County grand jury returned an 11-count indictment against Graham. Counts 1 through 9 of the indictment charged Graham with Rape, with each of those counts being a first-degree felony in violation of R.C. 2907.02(A)(1)(b). Counts 10 and 11 of the indictment charged Graham with Gross Sexual Imposition, with each of those counts being a third-degree felony in violation of R.C. 2907.05(A)(4).

{¶3} On November 20, 2024, Graham filed a written plea of not guilty with regard to all counts of the indictment. Nearly eight months of pretrial proceedings then ensued.

{¶4} On July 15, 2025, a jury trial commenced in the case. During the course of the three-day trial, the prosecution presented the testimony of five witnesses and ten evidentiary exhibits.

{¶5} After the State of Ohio rested its case, Graham moved for acquittal pursuant to Crim.R. 29. At that time, the prosecution moved to amend Counts 1 through 5 and Count 10 of the indictment, to modify the date ranges of the crimes alleged therein to conform with the evidence presented at trial. The trial court granted the motion to amend the indictment and overruled the motion for acquittal.

{¶6} Graham then opted to present a case, during which he testified on his own behalf. Following Graham's testimony, the defense indicated it had no other witnesses and no exhibits to present, and the defense rested its case. Graham renewed his Crim.R. 29 motion for acquittal, which was again overruled by the trial court.

{¶7} Following the closing arguments of counsel and instructions of law by the trial court, the jury received the case for deliberation in the early afternoon of July 17, 2025. Later that same afternoon, the jury returned verdicts finding Graham guilty as charged in the eleven counts of the amended indictment. The trial court accepted the verdicts and discharged the jury.

{¶8} The matter then proceeded directly to a sentencing hearing. The trial court sentenced Graham to a mandatory indefinite term of ten years to life in prison on each of the rape offenses (Counts 1 through 9), and to sixty months in prison on each of the gross sexual imposition offenses (Counts 10 and 11). The trial court ordered that Counts 2 through 9, representing separate incidents of anal rape, be served concurrently with each other, but that the concurrent sentences on those

counts be served consecutively to the sentence for Count 1, which was an incident of rape involving cunnilingus. The trial court further ordered that the sentences on Counts 10 and 11 be served consecutively to each other, and consecutively to all other sentences, resulting in an aggregate indefinite sentence of thirty years to life in prison. On July 18, 2025, the trial court journalized its sentencing orders.

{¶9} On July 29, 2025, Graham filed this appeal.

*Summary of Evidence Presented at Trial*

{¶10} The State of Ohio's first witness at trial was Kaleigh Omlor, formerly known as Kaleigh Graham. Omlor testified that she had known Graham for about eleven years, and that they had been married in September of 2020 and then divorced in May of 2025. Omlor testified that she has four children: a daughter, "G.O.", born in May of 2013 and who was twelve years old at the time of trial; a second daughter, who was nine years old at the time of trial; and two sons, who were eight and three at the time of trial. While Graham apparently fathered Omlor's younger children, Graham is not the biological father of G.O., meaning he was G.O.'s stepfather for the duration of Omlor's marriage to Graham.

{¶11} In her testimony, Omlor described the single-story, three-bedroom house in Lima, Ohio where she and Graham had lived from October of 2023 through the end of October of 2024, along with Omlor's four children and an older child who was Graham's biological son. During that time, G.O. shared a bedroom with her younger sister, in which the girls slept on bunk beds, and the three boys shared

-4-

another bedroom. Omlor further testified about the school attended by G.O. and the dates of when that school let out for the summer and resumed in the fall.

{¶12} During the general timeframe at issue in the case, being October of 2023 to October of 2024, Omlor worked a factory job several days per week from 6:00 a.m. until 6:30 p.m. After getting home from work, Omlor would fix a late dinner for the family and make sure the kids got showers, with the goal of getting the kids into bed by 10:00 p.m. on school nights. On weekends, the children were permitted to stay up later than 10:00 p.m. if they wished. On the days when Omlor was at work and the children were not in school, Graham would be at home with the children.

{¶13} After giving that initial background testimony, Omlor was recalled later in the trial to provide additional testimony. In that subsequent testimony, Omlor testified that on September 25, 2024, she was in the car with G.O., while the two of them were running an errand, and G.O. asked her mother if she remembered the time when she woke up in the middle of the night and found G.O. and Graham playing Fortnight in the living room. Omlor replied that she did recall that night, and G.O. then disclosed to her that, on that night, Graham had taken the couple's back massager and put it on G.O.'s private parts after pulling down her pants. In her testimony, Omlor confirmed that she recalled the night in question, because she had awakened in the middle of the night and found her husband and G.O. in the living room playing the video game.

{¶14} Omlor testified that, on September 25, 2024, after G.O. disclosed the massager incident to her, G.O. then began crying and explained that she had tried to tell her mother about it previously but had not wanted Graham to get in trouble. At that time, G.O. made no mention of any other inappropriate touching or conduct. Later that same date, Omlor confronted Graham about G.O.'s accusation and, while Graham denied any wrongdoing, he told Omlor he had used the massager on G.O. but only on her stomach. Graham suggested that G.O was making up the massager accusation because he had disciplined her by limiting her use of an electronic tablet.

{¶15} Omlor testified that she did not contact the police right away because of her concern that Graham might pose a threat to the family's safety if he was not arrested immediately. Instead, Omlor set up a camera at home to monitor the hallway and also took steps to line up childcare for the children so that she did not have to leave them in Graham's care while she was at work.

{¶16} Omlor testified that, on October 3, 2024, she took the children to her mother's house with the goal of asking her mother for guidance on how to handle the situation. While there, Omlor's brother, Braden, became aware that G.O. had accused Graham of doing something inappropriate of a sexual nature. After receiving that information, Braden left the house to go to the Grahams' residence to confront Graham about the accusations, while Omlor stayed at her mother's house with the children into the evening hours. During that visit, G.O. disclosed additional facts concerning Graham's inappropriate conduct toward her.

{¶17} Omlor testified that she and the children returned to their own home on the night of October 3, 2024 at approximately 10:30 to 11:00 p.m. Upon arriving home, Omlor found that her gun safe was open and her gun was missing, a screen-less window in the bedroom she shared with Graham was wide open, and Graham was gone. Omlor immediately texted Graham to ask where her gun was and why the bedroom window was wide open. Graham replied with a text saying that it was his gun, that he had taken it with him, and that he had jumped out the window because Omlor's brother had come over to the house.

{¶18} Omlor testified that she and her mother phoned the police that night and then, on the morning of October 4, 2024, Omlor drove to the Lima Police Department with all the children and made a police report. Omlor testified that the case was then assigned to Detective Stechschulte, who referred Omlor and G.O. to the Child Advocacy Center so that a private forensic interview of G.O. could be conducted. That interview was done on October 8, 2024. Omlor testified that a general medical exam of G.O. was also done, but that a more invasive exam was not done due to the length of time that had passed since the time G.O. reported having been raped.

{¶19} While on the witness stand at trial, Omlor also identified photographs taken of a storage drawer in her and Graham's bedroom, which showed the massager. Omlor also identified the massager itself in open court. Omlor further identified a number of text messages sent between herself and Graham in the last

week of September and the first week of October of 2024. While Graham did not directly admit to any wrongdoing in those messages, he apologized in the texts that he sent. He also urged Omlor to promise not to contact law enforcement, saying "[i]t's between us and God." (Tr., 366). In one of those text conversations, Omlor asked Graham to take a lie detector test.

{¶20} Finally, Omlor testified that Graham never returned to their home after he left on the night of October 3, 2024, after having climbed out the window.

{¶21} At trial, the second witness called by the prosecution was G.O., who testified in a room separate from the courtroom via electronic means. G.O. testified that she was twelve years old, and that she had previously lived in Lima with her mom, Graham, who was her her stepdad, and her four siblings. G.O. testified that they had lived in a one-story house with three bedrooms, and that her mom and Graham shared one bedroom, her brothers shared another room, and she and her younger sister shared the third bedroom, where they slept on bunk beds. G.O. testified that she slept on the top bunk and her sister slept on the bottom. G.O. testified that on school nights, she usually had to go to bed by nine o'clock, but that on weekends she would stay up later.

{¶22} G.O. testified that in September of 2024, she was in the car with her mom and she told her mom about an incident involving Graham. G.O. identified a photograph as being a massager and testified that something had happened with the massager when she was eleven years old. G.O. testified that she was in the living

room with Graham and that everyone else was asleep as it was probably past midnight. G.O. testified that she and Graham were playing Fortnight and that he brought out a massager from his bedroom. G.O. testified that he turned on the massager and, while it was vibrating, he placed it between her legs. G.O. testified that she had been wearing pants before that occurred but that Graham had removed her pants and underwear. G.O. identified the body part touched by the massager as being her "private", which is the area used to "pee" when she goes to the restroom. (Tr., 228-229). G.O. testified that, sometime later that evening, her mother came out from her bedroom and asked why G.O. was still awake. G.O finished playing the video game and then went to bed, and did not tell her mother about what had happened that night.

{¶23} G.O. testified that, another time late at night when she was also eleven years old, Graham put his mouth on the same private area that she had previously identified in court as being where he touched her with the massager. On that occasion, G.O. was sleeping on the floor in her bedroom because one of her brothers was in her bed. G.O. testified that she woke up to the sound of Graham's footsteps coming into the room, but that she pretended to be asleep. G.O. testified that Graham then put his mouth on her private area for twenty seconds and that she could feel his tongue on her. G.O. testified that she wanted to tell her mother what had happened but that she did not have a good opportunity to do so, as her siblings were always with her mother.

{¶24} G.O. testified that, on another date when she was eleven, while sitting on the couch watching TV with Graham, he put her hand on a private part of his body, which she described as being bare skin, shaped like a water bottle, and feeling somewhere between soft and hard. G.O. testified that Graham guided her hand to that part of his body and told her to squeeze a little with her hand, while he covered up her eyes with his hand. G.O. testified that the part of his body that Graham made her touch was between his legs.

{¶25} Finally, G.O. testified that Graham used that same private body part of his on several occasions to touch her "behind", "where I go poop." (Tr., 247-248). G.O. testified that this happened probably around ten different times, but "it felt like every day sometimes." (Tr., 246-247). G.O. testified that she was eleven years of age when those incidents occurred, and that it usually happened at night, after her bedtime, when she was in her bedroom. G.O. testified that she would be laying on her side in her bed and that Graham would lie down behind her, facing the same way she was. G.O. testified that Graham would remove her pants or underwear, and then "[h]e would do what parents do", which she could feel on the part of her body that she uses to "[g]o poop." (Tr., 251). G.O. testified that, when this occurred, she could feel Graham's body moving back and forth and that, each time it happened, she could feel something go inside the spot that she poops from and that it hurt a little. G.O. testified that, after that would happen, Graham would use a wet wipe to wipe the area of her behind that she had referenced him touching

with his private part, then he would put her clothes back on her and leave the room. G.O. testified that Graham told her not to tell anyone, including her mom, about what had happened, indicating that he and possibly her mother would go to jail.

{¶26} Retired Detective Kent Miller of the Lima Police Department was the third witness for the State of Ohio. Miller testified that, while employed by the Lima Police Department, he had been assigned to the digital forensics lab of the Northwest Ohio Technology Crimes Unit. Miller testified that, in the instant case, he was asked to perform an extraction of the data contained in Graham's cell phone, which Miller then did on October 4, 2024. At trial, Miller testified as to the data extraction he performed, and he identified printed-out reports reflecting some of the information found on Graham's cell phone. Those reports included a thread of text messages between Graham's phone and that of his wife at the time, as well as a history of the Internet searches performed on Graham's cell phone on October 4, 2024.

{¶27} The state's fourth witness at trial was Braden Garmatter, who is the brother of Kaleigh Omlor and, therefore, the maternal uncle of G.O. Garmatter testified that his sister had been in a relationship with Graham for approximately ten years and that, during that time, he and Graham got along with no problems. Garmatter testified that on October 3, 2024, he was present at his mother's house, and his sister and her children were there. Garmatter testified that

his sister and his mother were outside speaking with G.O. and, while the adult women were initially hesitant to tell him what was going on, he eventually learned from them that Graham had "messed with" G.O. (Tr., 409). Upon hearing that, Garmatter left and drove over to the Grahams' residence. Garmatter testified that he knocked on the door and, when Graham opened the door, Garmatter asked Graham what he had done to G.O. Garmatter testified that, in response, Graham acted confused. Garmatter testified that he posed the question again to Graham, and Graham slammed the door shut. Garmatter testified that he then heard footsteps walking or running through the house. Garmatter knocked on the door a few more times but Graham never came back to the door, so Garmatter finally got in his car and drove back to his mother's home.

{¶28} The state's fifth and final witness as trial was Detective Steven Stechschulte of the Lima Police Department. Stechschulte testified that he was assigned to work on the instant case on October 4, 2024. After Stechschulte learned that Graham was in possession of a firearm, Stechschulte had an exigent ping performed on Graham's cell phone through the phone company. Based on the result of the ping and information provided by Omlor, it was determined that Graham was near his mother's house in Lima. Officers then went to that location and took Graham into custody.

{¶29} Stechschulte testified that, later that same afternoon, he interviewed Graham, who consented to having his cell phone processed by police. The phone

was subsequently processed by Detective Kent Miller, and the data extraction revealed several exchanges of text messages between Graham and Omlor, as well as Internet searches made by Graham just prior to his arrest. Stechschulte testified that one of those Internet searches was "passing lie detector test – police", and another search was "beating lie detector test." There were also searches performed for "Ohio law on touching children", "what happens when you are accused of touching a child", and "police questioning procedure." Detective Stechschulte testified that he again interviewed Graham on October 7, 2024. Portions of the two recorded interviews with Graham were played for the jury at trial.

{¶30} After the State of Ohio rested its case, Graham testified on his own behalf. Graham testified that he was 33 years of age at the time of trial and that he had previously been married to Kaleigh Graham, making him a stepfather to G.O. Graham testified that he and G.O. had a good relationship while he was her stepparent.

{¶31} Graham testified that in late September of 2024, his wife asked him if he put a massager on G.O.'s private area. Graham testified that he told his wife he had not done so, but that he had used the massager to tickle G.O. on her upper chest and stomach. Graham testified that he never put the massager anywhere near G.O.'s vagina.

**{¶32}** Graham further testified that he had never placed his mouth on G.O.'s vagina, and that he had not engaged in anal intercourse with G.O., or touched her in the area of her anus in any way.

**{¶33}** Graham testified that he believed G.O. made the allegations against him because he had punished her by taking away her tablet. Graham testified that he had made the Internet searches found on his phone in order to understand the experiences of others with respect to those types of allegations. Finally, Graham acknowledged slamming and locking his front door and then fleeing the scene when Kaleigh's brother came to the door and asked him what he had done to G.O. Graham testified that he left the area that night because he did not know if Garmatter had a weapon.

*Assignments of Error Raised on Appeal*

**First Assignment of Error**

**The trial court plainly erred by providing jurors with improper jury instructions in violation of Graham's rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution.**

**Second Assignment of Error**

**The trial court committed plain error by failing to sever the rape and Gross Sexual Imposition charges within the indictment, thereby subjecting Mr. Graham to prejudicial joinder in contravention of Crim.R. 14.**

**Third Assignment of Error**

**Graham was denied effective assistance of counsel because the individual and cumulative effect of counsel's failures deprived Graham of his rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution.**

**Fourth Assignment of Error**

**Mr. Graham's convictions for GSI and rape were against the manifest weight of the evidence, in violation of his rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16 of Article I of the Ohio Constitution.**

*First Assignment of Error*

{¶34} In the first assignment of error, Graham contends that the trial court committed plain error with regard to two different jury instructions, one relating to the definition of "anal intercourse" provided to the jury and the other one being a "consciousness of guilt" instruction relating to evidence of flight.

{¶35} "'A trial court's instructions to a jury must correctly, clearly, and completely state the law applicable to the case.'" *State v. Johnson*, 2023-Ohio-2638, ¶ 32 (3d Dist.), quoting *State v. Orians*, 2008-Ohio-6185, ¶ 10 (3d Dist.). "Juries are entitled to 'all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder.'" *State v. Wilson*, 2024-Ohio-776, ¶ 28, quoting *State v. Comen*, 50 Ohio St.3d 206, paragraph two of the syllabus (1990).

**{¶36}** "Jury instructions are also to be 'appropriate to the facts of the case.'" *State v. Johnson*, *supra*, at ¶ 32, quoting *State v. Turner*, 2004-Ohio-6489, ¶ 35 (3d Dist.). "When a jury instruction is challenged as being incorrect, an appellate court 'must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights.'" *Johnson*, at ¶ 32, quoting *State v. Frye*, 2018-Ohio-894, ¶ 105 (3d Dist.). "'An appellate court reviewing jury instructions must examine the specific charge at issue in the context of the entire charge, and not in isolation.'" *Johnson*, at ¶ 32, quoting *Orians*, *supra*, at ¶ 10.

**{¶37}** Further, as the Supreme Court of Ohio explained in *State v. Gardner*, 2008-Ohio-2787, at ¶ 36:

> "Jury instructions that effectively relieve the state of its burden of persuasion violate a defendant's due process rights," *State v. Adams,* 103 Ohio St.3d 508, 2004 Ohio 5845, 817 N.E.2d 29, P 97, citing *Sandstrom v. Montana* (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39, and subvert the presumption of innocence and the right to have a jury determine the facts of a case. *Carella v. California* (1989), 491 U.S. 263, 265, 109 S.Ct. 2419, 105 L.Ed.2d 218.

**{¶38}** As a general rule, decisions on the giving of jury instructions are within a trial court's discretion, which an appellate court will not disturb absent an abuse of discretion. *See*, *e.g.*, *State v. Guster*, 66 Ohio St.2d 266, 271 (1981).

**{¶39}** Additionally, pursuant to Crim.R. 30(A), "[o]n appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter

objected to and the grounds of the objection." Thus, "'[a]bsent plain error, the failure to object to improprieties in jury instructions, as required by Crim.R. 30, is a waiver of the issue on appeal.'" *State v. Perkins*, 2025-Ohio-2390, ¶ 31 (3d Dist.), quoting *State v. Underwood*, 3 Ohio St.3d 12, 13 (1983). "As a result, '[t]he failure to object to a jury instruction constitutes a waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have been otherwise.'" *Perkins*, at ¶ 31, quoting *Underwood*, *supra*, at syllabus. "To demonstrate plain error under Crim.R. 52(B), the party asserting error must show that an error occurred, that the error was plain, and that the error affected his substantial rights." *State v. Bond*, 2022-Ohio-4150, ¶ 17. The Supreme Court of Ohio has interpreted the third prong of that test to mean "that the trial court's error must have affected the outcome of the trial." *Bond*, at ¶ 17, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). "'We recognize plain error with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice.'" *State v. Schmelzer*, 2024-Ohio-5987, ¶ 36 (3d Dist.), quoting *State v. Harrison*, 2015-Ohio-1419, ¶ 69 (3d Dist.).

{¶40} In the instant case, Graham first argues in the first assignment of error that the trial court erred when instructing the jury on the definition of "anal intercourse". This claim is relevant to Graham's convictions on Counts 2 through 9 of the indictment, which charged Graham with separate counts of anal rape in violation of R.C. 2907.02(A)(1)(b). Because Graham did not object to the trial

court's jury instruction with which he now claims error, Graham concedes that he has waived all but plain error on appeal with respect to the instruction at issue.

{¶41} As noted, in Counts 2 through 9 of the indictment, Graham was charged with, and ultimately found guilty of, anal rape in violation of R.C. 2907.02(A)(1)(b), which provides that "[n]o person shall engage in sexual conduct with another when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." R.C. 2907.01(A) defines "sexual conduct" as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." "Penetration, however slight, is sufficient to complete vaginal or anal intercourse." *Id*.

{¶42} At trial, when instructing the jury as to the requisite element of sexual conduct in the charges of Rape at issue here, the trial court gave the following instruction:

> In this case sexual conduct means anal intercourse, cunnilingus between personal (*sic*) regardless of sex, and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the anal opening of another.

(Tr., 548).

The trial court then proceeded to additionally instruct the jury as follows:

> Anal intercourse means penetration of the penis into the anal opening of a male or female. Sexual conduct includes anal intercourse with even the slightest penetration. *Where an alleged child victim states that poop comes out of her bottom, that the defendant placed his private part inside the child's bottom, and that when the defendant did this it hurt*, such evidence may be – may be – sufficient evidence of anal penetration.
>
> A reasonable inference that at least slight penetration had occurred can be made, but does not have to be made, *from the acts of spreading the cheeks of a child's buttock, making contact with the child's anal area, moving a penis or other object back and forth in the child's anal area and expressing an intention to have anal intercourse.*

(Tr., 548). (Emphasis added).

{¶43} On appeal, Graham argues that giving the portions of that jury instruction emphasized above was plain error in that such language constituted improper fact-finding by the trial court and amounted to an impermissible one-sided jury instruction suggesting that the trial court believed G.O.'s testimony was sufficient to establish guilt. Graham also argues that the instruction was an incorrect statement of law, based on the fact that the statutory definition of sexual conduct requires penetration but, here, the trial court instructed the jury that they could infer the element of penetration "from the acts of spreading the cheeks of a child's buttock, making *contact* with the child's anal *area*, moving a penis or other object back and forth in the child's anal *area* and expressing an intention to have anal intercourse." (Emphasis added). Graham asserts that none of those acts, individually or collectively, factually constitute penetration as defined by Ohio law.

{¶44} Upon review, this Court concludes that Graham's claim of plain error with regard to that instruction is well taken.

{¶45} In analyzing the issues presented by this jury instruction, we note as a preliminary matter that the record contains no information as to why the trial court decided to give the instruction at issue, or from what source or sources the language was derived, as the record should.

{¶46} However, this Court's legal research reflects that the first paragraph of the instruction was likely based on the decision of the Eighth District Court of Appeals in *In re M.P.*, 2023-Ohio-925 (8th Dist.). In *In re M.P.*, the court of appeals reviewed a challenge to the sufficiency of the evidence supporting the juvenile court's delinquency findings on allegations of anal rape, among other crimes. In denying that challenge on appeal, the court of appeals highlighted certain evidence in the record, stating:

> We specifically note that, during his interview with [the investigator], [the victim] stated that "poop comes out of his bottom" and that M.P. placed his private "inside" of [the victim's] bottom. (Tr. 32-33.) Neither party disputes that [the victim] could identify the relevant parts of his body. [The victim] clarified to [the investigator] that when M.P. did this, it hurt, and that it happened "more than one time." (Tr. 34.)

*In re M.P.*, at ¶ 39.

{¶47} In the instant case, this Court's research further reflects that the second paragraph of the instruction at issue was likely based on the decision of the Eighth District Court of Appeals in *State v. Johnson*, 2015-Ohio-4492 (8th Dist.). In

*Johnson*, the appellate court reviewed a challenge to the trial court's denial of a CrimR. 29 motion for acquittal on multiple charges, including allegations of anal rape. In finding that the evidence presented in that case supported the trial court's ruling on the motion for acquittal with regard to anal rape, the court of appeals stated:

> A reasonable inference could be made from the acts of placing [the victim] over a pillow, spreading her cheeks, making contact with the child's anal area, and expressing his intention to have anal intercourse, that at least slight penetration had occurred over the course of the ten-minute incident.

*Johnson*, at ¶ 22.

{¶48} Notably, neither *In re M.P.* or *Johnson* involved appellate review of a jury instruction utilizing the language quoted above.

{¶49} In the case *sub judice*, regardless of the source of the challenged instruction, this Court finds the language used by the trial court to be both erroneous and prejudicial for several reasons.

{¶50} In reaching this conclusion, we focus first on the language in the first paragraph at issue, in which the trial court instructed the jury that "[w]here an alleged child victim states that poop comes out of her bottom, that the defendant placed his private part inside the child's bottom, and that when the defendant did this it hurt, such evidence may be – may be – sufficient evidence of anal penetration." (Tr., 548).

{¶51} The term "sufficient evidence", which was used by the trial court in that portion of the instruction, is a well-established legal term denoting that adequate evidence had been presented by the prosecution to permit a criminal charge, or charges, to proceed to be given to the jury for its consideration. *See, e.g., State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997) ("With respect to sufficiency of the evidence, '"sufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law'", quoting Black's Law Dictionary (6 Ed.1990) 1433). See, also, Crim.R. 29(A).

{¶52} While the trial court here correctly instructed the jury during the general charge that the elements of any crime charged in the indictment must have been proven beyond a reasonable doubt before Graham could be found guilty of that crime, we nevertheless find the use of the term "sufficient evidence" in the jury instruction at issue to have been erroneous. By incorporating the term "sufficient evidence" into the jury instruction with regard to the evidence of penetration required to prove anal intercourse, the trial court effectively advised the jury that a standard lower than proof beyond a reasonable doubt was applicable to the requisite element of sexual conduct (i.e. anal intercourse) in Counts 2 through 9. As noted above, jury instructions that subvert the presumption of innocence and relieve the state of its burden are violative of a defendant's right to due process. *State v. Gardner*, 2008-Ohio-2787, ¶ 36.

{¶53} Next, in the second paragraph of the challenged jury instruction, the trial court instructed the jury that a reasonable inference that at least slight anal penetration had occurred could be made, but did not have to be made, "from the acts of spreading the cheeks of a child's buttock, making contact with the child's anal area, moving a penis or other object back and forth in the child's anal area and expressing an intention to have anal intercourse." (Tr., 548).

{¶54} While we acknowledge that the trial court used permissive language stating that an inference of anal penetration could be made, but did not have to be made, from the factual examples set forth in that portion of the instruction, we nonetheless find that the facts set forth in that portion of the instruction are, when viewed collectively, a prejudicial misstatement of the law on what is required to prove anal penetration.

{¶55} As previously noted, R.C. 2907.01(A) defines "sexual conduct" as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." R.C. 2907.01(A) further provides that "[p]enetration, however slight, is sufficient to complete vaginal or anal intercourse." *Id*.

{¶56} Thus, pursuant to R.C. 2907.01(A), the penetration, even though slight, required to constitute anal intercourse as a form of sexual conduct must be

penetration of the victim's "anal opening." In this case, by using the term "anal area", a phrase that connotes a portion of the body in the vicinity of the anus but not necessarily the anal opening itself, the trial court misadvised the jury on the legal definition of sexual conduct and, by doing so, lessened the requirement that the penetration necessary to prove sexual conduct be of the anal opening.

{¶57} With regard to both paragraphs of the jury instruction at issue, we conclude that additional error occurred through the inclusion of the factual examples within the instruction. As previously noted, Graham argues that such language constituted improper fact-finding by the trial court and amounted to an impermissible one-sided jury instruction suggesting that the trial court believed G.O.'s testimony.

{¶58} It is well established that, as the trier of fact, "[t]he jury is the sole judge of the weight of the evidence and the credibility of witnesses." *State v. Antill*, 176 Ohio St. 61, 67 (1964). A jury instruction may not invade the province of the jury by assuming a disputed fact is true. *See City of Maumee v. Anistik*, 69 Ohio St.3d 339 (1994).

{¶59} In this case, the jurors were correctly instructed as part of the general charge that they were "the sole judges of the facts, the credibility of the witnesses, and the weight of the evidence" and that, upon applying the tests of credibility properly outlined by the trial court, "you will assign to the testimony of each witness such weight as you deem proper." (Tr., 543). However, in the challenged

instruction, by then specifically highlighting facts relating to the alleged victim's testimony, upon which the jury was essentially instructed it could base a finding of guilt with regard to the anal rapes, the trial court not only placed undue emphasis on the evidence of that nature, which was in dispute, but also tended to imply that the trial court had found that testimony to be credible. As phrased, we find that the jury instruction improperly invaded the province of the jury by suggesting that disputed evidence was true.

{¶60} Finally, assuming for the sake of argument only that it was proper for the trial court to highlight disputed testimony in the jury instruction at issue, we also determine the instruction to be erroneous because the factual examples contained in the jury instruction do not accurately reflect facts that were testified to by the victim, or any other witness, in this case.

{¶61} Although a trial court "has broad discretion to decide how to fashion jury instructions," such instructions must "present a correct, pertinent statement of the law that is appropriate to the facts" of the case. *State v. White*, 2015-Ohio-492, ¶ 46, citing *State v. Griffin*, 2014-Ohio-4764, ¶ 5; *State v. Lessin*, 67 Ohio St.3d 487, 493 (1993). Accordingly, "a court should not give an instruction unless it is specifically applicable to the facts in the case." *State v. Fritz*, 2005-Ohio-4736, ¶ 19 (2d Dist.), citing *State v. Guster*, 66 Ohio St.2d 266 (1981).

{¶62} In the instant case, the trial record contains no evidence of "spreading the cheeks of a child's buttock" or of Graham "expressing an intention to have anal

intercourse", which were some of the factual examples provided to the jury in the challenged instruction. We find that giving a jury instruction including those very specific factual examples that were not supported by the evidence adduced at trial was both erroneous and prejudicial. The facts of the case did not support giving an instruction containing those factual examples, and the instruction misleadingly tended to suggest that such facts were in evidence when they were not.

{¶63} Having determined that the challenged jury instruction was erroneous for multiple reasons, we further conclude that, given the nature of the errors involved with the instruction, the instruction ultimately served to mislead the jury in a manner materially affecting Graham's substantial rights and the instruction therefore amounts to plain error on the facts of this case.

{¶64} "Jury instructions are critically important to assist juries in determining the interplay between the facts of the case before it and the applicable law." *State v. Griffin*, 2014-Ohio-4767, ¶ 5. "A trial court's instructions to a jury must correctly, clearly, and completely state the law applicable to the case." *State v. Orians*, 2008-Ohio-6185, ¶ 10 (3d Dist.).

{¶65} In this case, as reflected by our detailed summary of the trial evidence, *supra*, the testimony of the victim, G.O., was the only evidence presented at trial that tended to establish the sexual conduct, being anal intercourse, at issue in Counts 2 through 9. Accordingly, the materially prejudicial impact of the erroneous jury instruction cannot be underestimated when that instruction unduly emphasized the

victim's testimony, suggested that testimony to be true, highlighted facts supporting proof of anal intercourse when those facts were not in evidence, and served to advise the jury that a standard lower than that of proof beyond a reasonable doubt was applicable to the requisite element of sexual conduct in Counts 2 through 9. The record also reflects that the prosecution quoted both parts of the erroneous jury instruction in its closing argument, when urging the jury to find on Counts 2 through 9 that anal intercourse had been proven through G.O.'s testimony, a fact which we find to have exacerbated the substantial and material prejudice stemming from the instruction.

{¶66} Accordingly, on the basis of the plainly erroneous instruction relating to the definition of "anal intercourse" provided to the jury, reversal of Counts 2 through 9 is required to prevent a manifest miscarriage of justice in this case.

{¶67} In the first assignment of error, Graham also argues that the trial court committed plain error in giving a consciousness of guilt instruction based on evidence of flight, a claim which relates to all counts of the indictment.

At issue here is the following jury instruction given by the trial court:

Now, testimony had been admitted indicating that the defendant fled from [his home] when confronted about the allegation in this case * * *. You are instructed that this type of conduct alone does not raise a presumption of guilt, but it may tend to indicate the defendant's consciousness or awareness of guilt. If you find that the facts do not support that the defendant fled * * *, or if you find that some other motive prompted the defendant's conduct, or if you are unable to decide what the defendant's motivation was, then you should not consider this evidence for any purpose. However, if you find that the

-27-

facts support that the defendant engaged in such conduct, and if you decide that the defendant was motivated by a consciousness or an awareness of guilt, you may, but are not required to, consider this evidence in deciding whether the defendant is guilty of the crimes charged. You alone will determine what weight, if any, to give to this evidence.

(Tr., 549-550).

{¶68} On appeal, Graham does not dispute that the consciousness of guilt instruction given by the trial court was a correct statement of law, but he maintains that it was not warranted by the evidence. Again, because no objection was lodged by the defense at trial to the instruction at issue, a plain-error analysis applies.

{¶69} "Requested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *State v. Adams*, 2015-Ohio-3954, ¶ 240, citing *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591 (1991).

{¶70} We review a trial court's decision to give a particular jury instruction for abuse of discretion. *State v. Robinson*, 2019-Ohio-558, ¶ 30 (10th Dist.). With regard to the instruction at issue, evidence of flight, meaning evidence of "'some escape or affirmative attempt to avoid apprehension,'" is admissible to show consciousness of guilt. *Robinson*, at ¶ 29, quoting *State v. Robinson*, 2007-Ohio-2388, ¶ 19 (1st Dist.).

**{¶71}** As the Supreme Court of Ohio explained in *State v. Hand*, 2006-Ohio-18, "'"'flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct are admissible as evidence of consciousness of guilt, and thus of guilt itself.'"'" *Id.*, at ¶ 167, quoting *State v. Eaton*, 19 Ohio St.2d 145, 160 (1969), quoting 2 *Wigmore on Evidence*, (3d Ed. 1979) 111, Section 276. A consciousness of guilt jury instruction, based on the accused's flight, is appropriate when supported by sufficient evidence. *Robinson*, 2019-Ohio-558 (10th Dist.), ¶ 29, citing *State v. Grindstaff*, 2014-Ohio-2581, ¶ 29 (12th Dist.).

**{¶72}** In this case, Graham argues that evidence that he left his house when confronted by his brother-in-law did not support giving a consciousness of guilt instruction. We disagree. While Graham asserts that the evidence was that he merely retreated from a potentially dangerous situation, we find that the evidence also supports an inference that Graham took measures to avoid being found. Specifically, when confronted by his brother-in-law about G.O.'s allegations, Graham was then on notice that his wife had not kept those allegations to herself. In response, Graham immediately slammed the door on his brother-in-law, armed himself with a firearm, and then fled the house by climbing through a back window. Graham did not return to his home that evening, nor the next day prior to his arrest at his mother's house, and there was no indication that he alerted his wife to his whereabouts during the hours that he had gone missing.

{¶73} Under those circumstances, we conclude that the trial court did not abuse its discretion by giving a neutral jury instruction on consciousness of guilt, and that the giving of that instruction did not amount to plain error. *See State v. Aekins*, 2023-Ohio-322, ¶ 119 (10th Dist.) (characterizing a jury instruction as "neutral in its effect, as it instructed the jury that it could, but was not required to, consider the evidence of appellant's flight in determining whether appellant was guilty of the crimes charged).

{¶74} For the reasons stated, Graham's first assignment of error is sustained in part and overruled in part.

*Second Assignment of Error*

{¶75} In the second assignment of error, Graham argues that the trial court committed plain error by failing to sever the Rape and Gross Sexual Imposition charges for purposes of trial, thereby subjecting Graham to prejudicial joinder.

{¶76} Crim.R. 8(A) governs joinder of offenses, and provides that "[t]wo or more offenses may be charged in the same indictment" if the offenses charged "are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct."

{¶77} "Ohio 'favors joining multiple offenses in a single trial * * * if the offenses charged "are of the same or similar character."'" *State v. Spaulding*, 2016-Ohio-8126, ¶ 61, quoting State *v. Lott*, 51 Ohio St.3d 160, 163 (1990), quoting

Crim.R. 8(A). Joinder is to be liberally permitted "to conserve judicial resources, reduce the chance of incongruous results in successive trials, and diminish inconvenience to the witnesses." *State v. Schaim*, 65 Ohio St.3d 51, 58 (1992).

{¶78} "Notwithstanding the policy in favor of joinder," Crim.R. 14 permits a defendant to request severance of the "counts of an indictment on the grounds that he or she is prejudiced by the joinder of multiple offenses." *State v. LaMar*, 2002-Ohio-2128, ¶ 49.

{¶79} In relevant part, Crim.R. 14 provides that "[i]f it appears that a defendant * * * is prejudiced by a joinder of offenses * * * in an indictment, * * * the court shall order an election or separate trial of counts * * * or provide such other relief as justice requires."

{¶80} In moving for severance pursuant to Crim.R. 14, the defendant "has the burden of furnishing the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial." *State v. Torres*, 66 Ohio St.2d 340, 343 (1981). "Even then, the state can overcome a defendant's claim of prejudicial joinder by showing either that (1) it could have introduced evidence of the joined offenses as 'other acts' under Evid.R. 404(B) or (2) the 'evidence of each crime joined at trial is simple and direct.'" *Spaulding, supra*, at ¶ 62, quoting *State v. Lott, supra*, at 163.

{¶81} Normally, a trial court's ruling on a Crim.R. 14 motion to sever is reviewed on appeal for an abuse of discretion. *State v. Hand*, 2006-Ohio-18, ¶

-31-

166. However, if a defendant did not file a Crim.R. 14 motion to sever in the trial court, then claims of prejudicial joinder are reviewed for plain error on appeal. *Spaulding*, ¶ 64, citing *Lott* at 164.

{¶82} To prevail under the plain error standard, the defendant must establish that an error occurred, it was obvious, and it affected his or her substantial rights. *Spaulding*, at ¶ 64, citing Crim.R. 52(B); *State v. Barnes*, 2002-Ohio-68 (2002). Notice of plain error on appeal is to be taken "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, paragraph three of the syllabus (1978).

{¶83} In the instant case, as has been previously noted, Graham was tried on an 11-count indictment. Counts 1 through 9 of the indictment charged Graham with Rape, with each of those counts being a first-degree felony in violation of R.C. 2907.02(A)(1)(b). Counts 10 and 11 of the indictment charged Graham with Gross Sexual Imposition, with each of those counts being a third-degree felony in violation of R.C. 2907.05(A)(4).

{¶84} On appeal, Graham argues that he was subjected to prejudicial joinder and that the trial court erred by failing to sever the Rape and Gross Sexual Imposition charges for trial. In support of that claim, Graham asserts that evidence of the gross sexual imposition offenses amounted to impermissible evidence that he had the propensity to commit Rape, and that evidence of the rape offenses amounted

-32-

to impermissible evidence that he had the propensity to commit Gross Sexual Imposition.

{¶85} In reviewing this claim, we note as a preliminary matter that Graham did not file a motion to sever the offenses in the trial court, nor did he otherwise raise any objection to the eleven counts of the indictment being charged or tried together. Accordingly, a plain error analysis applies.

{¶86} Upon review of the trial record before us, we conclude that joinder of all eleven offenses in the indictment was proper pursuant to Crim.R. 8 because the crimes charged in each count were of the same or similar character and, further, were all part of a course of criminal conduct. The eleven crimes charged in the indictment were all sex offenses, alleged to have been perpetrated against a single victim, and all of the incidents occurred at the same location, under very similar circumstances, and occurred within a relatively limited timeframe. Moreover, Graham has failed to demonstrate any prejudice on appeal by the joinder of the eleven offenses for trial, as the evidence relating to each individual offense was simple and direct. There is no indication from the record that the jury confused the evidence as to the different counts or that it was influenced by the cumulative effect of the joinder. With regard to that latter issue, we also note that the trial court instructed the jury as part of the general charge in the case as follows:

> The charges set forth in each count in the indictment constitute a separate and distinct matter. You must consider each count and the

evidence applicable to each count separately and you must state you finding as to each count uninfluenced by your verdict as to any other count. The defendant may be found guilty or not guilty of any one or all of the offenses charged.

(Tr., 541). "A jury is presumed to follow the instructions given to it by the trial judge." *State v. Loza*, 71 Ohio St.3d 61, 75 (1994).

{¶87} For all of those reasons, had the defense filed a motion to sever the counts in the indictment for purposes of trial, the trial court would have been well within its discretion in denying such a motion. Accordingly, the failure of the trial court to *sua sponte* sever the counts in the indictment for trial falls well short of plain error.

{¶88} The second assignment of error is overruled.

*Third Assignment of Error*

{¶89} In the third assignment of error, Graham argues that he was deprived of the effective assistance of trial counsel. Graham asserts that three different omissions on counsel's part amounted to ineffective assistance of counsel, both individually and cumulatively.

{¶90} "[I]n Ohio, a properly licensed attorney is presumed competent." *State v. Gondor*, 2006-Ohio-6679, ¶ 62. To prove ineffective assistance of counsel, a defendant must establish that: (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel's performance is deficient if it falls below an objective

standard of reasonable representation. *State v. Bradley*, 42 Ohio St.3d 136, paragraph two of the syllabus (1989). Prejudice exists if there is "a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different." *State v. Sowell*, 2016-Ohio-8025, ¶ 138.

{¶91} "Under [the] doctrine of cumulative error, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal." *State v. Spencer*, 2015-Ohio-52, ¶ 83 (3d Dist.), citing *State v. Powell*, 2012-Ohio-2577, ¶ 222-224; *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). "'To find cumulative error, a court must first find multiple errors committed at trial and determine that there is a reasonable probability that the outcome below would have been different but for the combination of the harmless errors.'" *State v. Stober*, 2014-Ohio-5629, ¶ 15 (3d Dist.), quoting *In re J.M.*, 2012-Ohio-1467, ¶ 36 (3d Dist.).

{¶92} "'The Ohio Supreme Court previously recognized that the doctrine of cumulative error may be applied to a claim of ineffective assistance of counsel.'" *State v. Bruce*, 2023-Ohio 3298, ¶ 111 (3d Dist.), quoting *State v. Hopings*, 2022-Ohio-1532, ¶ 44 (6th Dist.). However, "'[e]ach assertion of ineffective assistance of counsel going to cumulative error depends on the merits of each individual claim; when none of the individual claims of ineffective assistance of counsel have merit, cumulative error cannot be established simply by

joining those meritless claims together.'" *State v. Gear*, 2023-Ohio-1246, ¶ 59 (3d Dist.), quoting *State v. Graham*, 2020-Ohio-6700, ¶ 170.

**{¶93}** In the instant case, Graham first asserts that his counsel was ineffective in not objecting to testimony regarding Graham's possession of a firearm and potential for violence. Graham argues that the evidence of his abruptly fleeing his home with a firearm and of his wife's and the investigating detective's resulting concern that Graham could pose a risk of harm was irrelevant, inadmissible, and unfairly prejudicial pursuant to Evid.R. 401, 402, and 403. We disagree.

**{¶94}** Pursuant to Evid.R. 401, "relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

**{¶95}** Evid.R. 402 provides that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio. Evidence which is not relevant is not admissible."

**{¶96}** Pursuant to Evid.R. 403(A), "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶97} In the instant case, the evidence at trial reflected that the abuse allegations made by G.O. were not immediately reported to the authorities by her mother, and the reasons for that delay in contacting law enforcement was a relevant issue to address at trial. For that reason, G.O.'s mother testified that she was worried about her family's safety should her husband not immediately be arrested. G.O.'s mother then testified that, several days later, she reported the abuse allegations to the Lima Police Department after Graham fled their home, having taken a firearm and then climbed out a window. The investigating detective, Detective Stechschulte, testified as to how and why an exigent ping of Graham's cell phone was used to locate him, which included the fact that Graham's location was unknown and that the detective was concerned because Graham had taken a firearm from the home. That testimony was relevant to show how and where Graham was located and, in particular, why a ping of his phone was done in order to locate him.

{¶98} Our review of the record reflects that the testimony at issue was probative to the chronology of the events in the case and was not unfairly prejudicial. The testimony of which Graham complains of here was limited in scope and the testimony was not offered nor argued by the prosecution as being evidence reflecting a general propensity on Graham's part to be prone to violence or criminal acts.

{¶99} For those reasons, the trial court did not err in admitting the challenged testimony and, therefore, Graham's trial counsel was not ineffective in failing to

object to the testimony. "A defense counsel's failure to object is not ineffective assistance of counsel if the evidence is admissible." *State v. Brown*, 2020-Ohio-3614, ¶ 79 (3d Dist.).

{¶100} In this third assignment of error, Graham also argues that his trial counsel was ineffective in failing to move to sever the Rape and Gross Sexual Imposition charges in the indictment. This claim directly relates to the argument raised by Graham in the second assignment of error, *supra*. After considering the merit of that claim, we concluded that Graham did not demonstrate error as to the issue of joinder or the lack of severance. Accordingly, his counsel was not ineffective for failing to file a motion seeking to sever certain counts of the indictment, as Ohio courts have long held that trial counsel is not ineffective for failing to file a motion that had no reasonable probability of success. *See, e.g., State v. Boone*, 2023-Ohio-2017, ¶ 11 (9th Dist.), citing *State v. Clutter*, 2008-Ohio-3954, ¶ 19 (9th Dist.); *State v. Jones*, 2019-Ohio-2134, ¶ 52 (10th Dist.); *State v. Adkins*, 2005-Ohio-2577, ¶ 14 (4th Dist.).

{¶101} Graham further argues that his counsel was ineffective in not objecting to the jury instruction regarding anal intercourse and penetration. However, our resolution of the first assignment of error, *supra*, renders this argument moot and we decline to address it. See App.R. 12(A)(1)(c).

{¶102} Finally, Graham argues that cumulative error resulted from the three omissions of counsel about which Graham individually assigns error. This Court,

having found no error on counsel's part with regard to two of those claims and having found the third claim to be moot, finds Graham's cumulative error argument to be without merit.

**{¶103}** The third assignment of error is overruled.

*Fourth Assignment of Error*

**{¶104}** In the fourth assignment of error, Graham argues that his convictions on all eleven counts of the amended indictment were against the manifest weight of the evidence.

**{¶105}** When determining whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). In doing so, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* Nevertheless, when assessing a manifest-weight challenge, a reviewing court must still allow the trier-of-fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. Stewart*, 2023-Ohio-253, ¶ 11 (3d Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs

heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524, ¶ 119.

{¶106} In the instant case, as a preliminary matter, we note that our disposition of the first assignment of error, *supra*, renders moot the manifest weight arguments made by Graham in this fourth assignment of error as to Counts 2 through 9. Therefore, we need not analyze the weight of the evidence with regard to those eight counts. App.R. 12(A)(1)(c).

{¶107} With regard to the remaining three counts upon which Graham was convicted and sentenced, the record reflects the following. In Count 1, Graham was found guilty of Rape in violation of R.C. 2907.02(A)(1)(b), with the sexual conduct at issue in that count based on the allegation that he performed cunnilingus on G.O., who was age 11 at the time. In Counts 10 and 11, Graham was found guilty of Gross Sexual Imposition in violation of R.C. 2907.05(A)(4).

{¶108} Thus, at issue in Count 1 was the crime of Rape in violation of R.C. 2907.02(A)(1)(b), which provides that "[n]o person shall engage in sexual conduct with another when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." Pursuant to R.C. 2907.01(A), "sexual conduct" means "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the

body or any instrument, apparatus, or other object into the vaginal or anal opening of another."

{¶109} In Counts 10 and 11, at issue was the crime of Gross Sexual Imposition in violation of R.C. 2907.05(A)(4), which provides that "[n]o person shall have sexual contact with another; cause another to have sexual contact with the offender; or cause two or more other persons to have sexual contact when * * * [t]he other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person." Pursuant to R.C. 2907.01(B), "sexual contact" means "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."

{¶110} On appeal, Graham asserts that his convictions were against the manifest weight of the evidence as the prosecution introduced no DNA evidence or evidence of any physical injury to G.O. in order to corroborate G.O.'s testimony about the sexual assaults, testimony that Graham argues was contradictory and not credible.

{¶111} Contrary to Graham's claims, a thorough review of all the evidence presented at trial does not reflect that his convictions on Counts 1, 10, and 11 were against the manifest weight of the evidence.

{¶112} With regard to Graham's argument about the lack of physical evidence, "there is no requirement that testimonial evidence of sexual abuse must be corroborated by physical or other evidence." *State v. Kaufman*, 2010-Ohio-1536, ¶ 71 (7th Dist.), citing *In re Hollobaugh*, 2009-Ohio-797, ¶ 21 (7th Dist.). *Accord*, *In re B.D.H.*, 2020 Ohio App. LEXIS 3743, ¶ 9 (12th Dist. Oct. 13, 2020) (noting that court and other Ohio appellate districts have held that there is no requirement that sexual conduct must be proven by medical or physical evidence, citing *State v. Boles*, 2013-Ohio-5202, ¶ 40 (12th Dist.); *In re N.J.M.*, 2010-Ohio-5526, ¶ 38 (12th Dist.); *State v. Dade*, 2020-Ohio-4545, ¶ 28 (6th Dist.); *State v. Fair*, 2019-Ohio-2508, ¶ 51 (11th Dist.). Additionally, the lack of physical evidence in this case is understandable, given that the crimes were not reported by the young victim until many weeks and/or months after the criminal acts were alleged to have occurred. With regard to the delay in telling her mother and, subsequently, the investigating authorities what Graham had subjected her to, G.O. provided a reasonable explanation at trial as to why she did not disclose the crimes until a period of time after they had occurred. Further, as this Court noted in *State v. Lewis*, 2020-Ohio-6894 (3d Dist.), "courts across this state have concluded that a delay in reporting allegations of sexual abuse does not necessarily indicate that a conviction for the related offenses is against the manifest weight of the evidence." *Id.* at ¶ 55, citing *State v. Bones*, 2015-Ohio-784, ¶ 33-34 (2d Dist.); *State v. Lykins*,

2019-Ohio-3316, ¶ 50 (4th Dist.); *State v. Weaver*, 2019-Ohio-2715, ¶ 8 (7th Dist.);

*State v. Mathis*, 2004-Ohio-2982, ¶¶ 25, 27 (8th Dist.).

{¶113} As for the testimony given by G.O., which directly established all elements of the crimes at issue here, Graham points only to minor conflicting details in support of his claim that her testimony was not credible. Moreover, the jury was able to see, hear, and evaluate G.O.'s testimony and was free to believe or disbelieve any or all of that testimony. *State v. Williams*, 2024-Ohio-2307, ¶ 27 (3d Dist.), citing *State v. Shockey*, 2024-Ohio-296, ¶ 24 (3d Dist.).

{¶114} Finally, as to all three counts at issue, while Graham testified at trial that the events testified to by G.O. never happened, "[a] verdict is not against the manifest weight of the evidence because the [jury] chose to believe the State's witnesses rather than the defendant's version of the events." *State v. Hooper*, 2022-Ohio-2990, ¶ 29 (3d Dist.).

{¶115} In summary, following this Court's independent review of the record and weighing of the evidence and all reasonable inferences therefrom, we conclude that this is not the exceptional case where the evidence weighed heavily against conviction, nor is there any indication that the jury lost its way in finding Graham guilty of the three counts at issue here.

{¶116} The fourth assignment of error is overruled.

*Conclusion*

**{¶117}** Having found error prejudicial to the defendant-appellant as assigned and argued in the first claim presented in the first assignment of error, the judgment of conviction and sentence entered in the Allen County Court of Common Pleas as to Counts 2 through 9, inclusive, is reversed. Having found no error prejudicial to the defendant-appellant as assigned and argued in the second claim presented in the first assignment of error, or in the remaining assignments of error, the judgment of conviction and sentence entered in the trial court as to the remaining counts of the indictment is affirmed. The case is remanded for further proceedings consistent with this opinion.

*Judgment affirmed in part,*
*Reversed in part, and*
*Cause remanded.*

**ZIMMERMAN, P.J., and MILLER, J., concur.**

Case No. 1-25-41

# JUDGMENT ENTRY

For the reasons stated in the opinion of this Court, it is the judgment and order of this Court that the judgment of the trial court is affirmed in part and reversed in part with costs assessed equally between Appellant and Appellee for which judgment is hereby rendered. The cause is hereby remanded to the trial court for further proceedings and for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

_____
Juergen A. Waldick, Judge

_____
William R. Zimmerman, Judge

_____
Mark C. Miller, Judge

DATED:
/jlm